<table>
<tr><td>

FILED & JUDGMENT ENTERED

Steven T. Salata

Jul 06 2011

Clerk, U.S. Bankruptcy Court
Western District of North Carolina

</td></tr>
</table>

_J. Craig Whitley_

_____
J. Craig Whitley
United States Bankruptcy Judge

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT COURT OF NORTH CAROLINA
## WILKESBORO DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | CASE NO. 07-50997 |
| | ) | CHAPTER 7 |
| SOUTHERN HOSIERY MILL, INCORPORATED, | ) | |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| | ) | Adversary Proceeding No. 09-5048 |
| BARRETT L. CRAWFORD, TRUSTEE OF THE ESTATE OF SOUTHERN HOSIERY MILL, INCORPORATED, | ) | (Lead Case) |
| | ) | Adversary Proceeding No. 09-5042 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **ORDER (1) GRANTING IN** |
| | ) | **PART, DENYING IN PART,** |
| THE CIT GROUP/COMMERCIAL SERVICES, | ) | **CIT'S MOTION FOR** |
| INC., CAROLINA FINISHING OF NORTH | ) | **SUMMARY JUDGMENT, (2)** |
| CAROLINA, LLC, REGAL MANUFACTURING | ) | **GRANTING IN PART** |
| COMPANY, INC., ITALIAN FABRIC, INC. and | ) | **SUMMARY JUDGMENT TO** |
| FINANCE ONE, INC., | ) | **THE TRUSTEE, (3) DISMISSING** |
| | ) | **CERTAIN CLAIMS, AND (4)** |
| Defendants. | ) | **RESERVING CIT'S SECTION** |
| | ) | **506(b) CLAIM FOR TRIAL** |
| _____ | ) | |

CIT Group/Commercial Services, Inc. ("CIT") and the Chapter 7 Trustee, Barrett L.

Crawford ("Trustee") have filed competing actions against one another in this bankruptcy case,

each arising from the Debtor's prepetition factoring arrangement with CIT.  By agreement, these

two actions were consolidated.  Am. Consent Order Granting Joint Mot. to Consolidate, May 17,

2010, Adv. No. 09-5048, ECF No. 20.  CIT has now filed a Motion for Summary Judgment that

touches upon each of the causes of action raised by the two complaints as well as CIT's

counterclaim in the Trustee's action (Adv. No. 09-5048).  An Objection to that Motion was

interposed by the Trustee, and a hearing was held on March 18, 2011.

Having considered the parties' pleadings, discovery responses, affidavits, and briefs, I

conclude that with one exception [CIT's Section 506(b) claim for interest and fees pled in Count

3 of CIT's Complaint (Adv. No. 09-5042) and Count 3 of CIT's Counterclaim (Adv. No. 09-

5048)], either there are no genuine issues of material fact and the claims may be decided as a

matter of law, and/or the claims in question are mooted by other rulings and should be dismissed.

Given the multiple and overlapping counts asserted, the disposition is complicated.

## I.      *Trustee's Action (09-5048)*

In Adversary No 09-5048,  the counts raised by the Trustee's Complaint are disposed of

as follows:

- Count 1: Summary judgment to CIT (save and except for the net Credit Balance).

- Count 2: Summary judgment to CIT.

- Count 3: Partial summary judgment to CIT (to the extent Trustee alleges CIT violated the

  automatic stay, Trustee's Compl. ¶ 52, Adv. No. 09-5048, ECF No. 1); partial summary

  to the Trustee (to the extent the Trustee asks this Court to enjoin CIT from offsetting the

  Credit Balance against the Ledger Debt, Trustee's Compl. ¶ 54, Adv. No. 09-5048, ECF

  No. 1).

- Counts 4-8: Moot and are dismissed.

2

- Count 9: Summary judgment to CIT (except CIT must apply for Section 506(b) fees, and that matter is reserved for trial).

- Additional unpled count raised by the Trustee, Trustee's Br. 6-7, Adv. No. 09-5048, ECF No. 35, and argued by the parties, as to whether CIT willfully violated the automatic stay (11 U.S.C. § 362) by returning payments to Debtor's customers: Summary judgment to CIT.

- Additional unpled count raised by the Trustee, Trustee's Br. 7-8, Adv. No. 09-5048, ECF No. 35, and argued by the parties, as to whether the Minimum Commission Fee was unreasonable and disallowed under Section 506(b): Summary judgment to CIT.

- Additional unpled count raised by the Trustee, Trustee's Br. 4-6, Adv. No. 09-5048, ECF No. 35, and argued by the parties, pertaining to the Ledger Debt: Summary judgment to Trustee.

- Additional unpled count raised by CIT, CIT's Br. Supporting its Mot. 25-26, Adv. No. 09-5048, ECF No. 33, and argued by the parties, pertaining to whether CIT is prohibited from offsetting the Ledger Debt against the Credit Balance: Summary judgment to Trustee.

- Counterclaim Count 1: Partial summary judgment to the Trustee on the question of whether CIT has a perfected security interest in the Debtor's Credit Balance (as opposed to whether CIT has a recoupment right to the Minimum Commission fee and therefore a secured claim); partial summary judgment to CIT (as to CIT's right to recoup the Minimum Commission Fee).

- Counterclaim Count 2: Partial summary judgment to the Trustee (as to whether the Credit Balance can be applied to the Ledger Debt); partially moot and is dismissed (to the extent

3

CIT seeks relief from automatic stay to recoup the Minimum Commission Fee).

- Counterclaim Count 3: Partial summary judgment to CIT (excluding a determination of the amount of the attorneys' fees and expenses to be offset, which is reserved for trial).

## II.    *CIT's Action (09-5042)*

- Count 1: Partial summary judgment to the Trustee as to whether CIT has a perfected security interest in the Debtor's Credit Balance (as opposed to whether CIT has a recoupment right to the Minimum Commission fee and therefore a secured claim in the Debtor's Credit Balance); partial summary judgment to CIT (to the extent of that recoupment right for the Minimum Commission Fee and certain attorneys' fees and expenses).

- Count 2: Partial summary judgment to the Trustee (as to whether the Credit Balance can be applied to the Ledger Debt); partially moot and is dismissed (to the extent CIT seeks relief from automatic stay to recoup the Minimum Commission Fee).

- Count 3: Partial summary judgment to CIT (however, the determination of the amount of CIT's allowable Section 506(b) attorneys' fees and expenses is reserved for trial).

Given these dispositions, the only factual issue to be determined is the last one mentioned—the allowed amount of CIT's Section 506(b) charges.  After these sums are determined, the allowed amount may be offset by CIT against the Debtor's Credit Balance, and any remaining balance owed to the Debtor shall be paid by CIT to the Trustee.

## STATEMENT OF FACTS

## I.    *The Factoring Agreement*

Southern Hosiery Mill, Incorporated (the "Debtor") and CIT (as successor to SunTrust

Bank, N.A.) entered into a factoring agreement, dated November 30, 2002 (the "Factoring

Agreement"). Factoring Agreement, Adv. No. 09-5048, ECF. No. 33-2. Pursuant to the

Factoring Agreement, the Debtor sold and assigned to CIT all of its accounts and related

property, and CIT made advances and extended financial accommodations to the Debtor, all as

more particularly described therein.

As security for making advances and extending financial accommodations to the Debtor,

the Debtor conveyed to CIT a security interest in:

> (i) all of Debtor's accounts (as defined in the UCC); (ii) all of Debtor's
> contract rights related or incident to such accounts; (iii) all of Debtor's other
> rights to the payment of money related or incident to such accounts,
> including, without limitation, rights evidenced by instruments of chattel
> paper; (iv) all of Debtor's interest of whatever kind and description in goods
> or inventories, the sale of which has given rise to an account, including
> without limitation, goods billed to the account debtor and held by Debtor in
> accordance with the applicable purchase contract; (v) all general intangibles
> arising from or related or incident to any of Debtor's accounts or any of
> Debtor's goods or inventories, the sale of which has given rise to an
> account; (vi) letter of credit rights and letters of credit arising from or
> related or incident to any of Debtor's accounts or any of Debtor's goods or
> inventories, the sale of which has given rise to an account; (vii) all goods,
> documents of title, policies and certificates of insurance, securities,
> instruments, chattel paper, deposits and deposit accounts with CIT
> (including without limitation, the Factoring Account [as such term is
> defined in the Factoring Agreement] and all reserves and reserve accounts),
> cash or other property that are now or may hereafter be in CIT's possession
> or as to which CIT may now or hereafter control possession by documents
> of title or otherwise; and (viii) all proceeds and products of each of the
> foregoing (collectively, the "Collateral").

CIT perfected its security interest by filing a UCC financing statement in the Office of

the Secretary of State of North Carolina on December 23, 2002, as later amended on May 17,

2005, and as continued by a Financing Statement filed with the Secretary of State on July 20,

2007 (collectively, the "UCC Financing Statement").

## II.    The Minimum Commission Fee

Among other things, the Factoring Agreement required the Debtor to pay (i) a minimum

commission fee (the "Minimum Commission Fee") as set forth in Paragraph 23 of the Factoring

Agreement; (ii) any applicable ledger debt as set forth in Paragraph 5 of the Factoring

Agreement; and (iii) all costs and expenses, including reasonable attorneys' fees, in connection

with the enforcement of the Factoring Agreement pursuant to Paragraph 24 of the Factoring

Agreement.  Factoring Agreement, Adv. No. 09-5048, ECF. No. 33-2.

Regarding the Minimum Commission Fee, Paragraph 23 provides:

> If the actual factoring fees or charges paid to [CIT] by [the Debtor] during
> any Contract Year, or part thereof, are less than $35,000, [CIT] shall charge
> [the Debtor's] Factoring Account as of the end of such Contract Year with
> an amount equal to the difference between the actual factoring fees or
> charges paid during such Contract Year and the Minimum Commission
> Fees.

The Factoring Agreement was dated December 2, 2002, and Paragraph 17 provided that

it remained in full force and effect until terminated either by CIT or the Debtor upon thirty (30)

days written notice of termination.  Id.  Each year that the Factoring Agreement remained in

effect is a "contract year."  Id.  The actual factoring fees or charges paid by the Debtor to CIT

under the Factoring Agreement for the period from December 2, 2006, to the Bankruptcy

Petition Date totaled $12,861.10, or $22,138.90 less than the required amount due to CIT for the

Contract Year (or part thereof).

The Debtor filed this voluntary chapter 7 case on October 22, 2007 (the "Petition Date").

At the Petition Date, the Debtor had a credit balance with CIT under the Factoring Agreement of

$61,353.34[1] (the "Debtor's Credit Balance").  CIT was given notice of the bankruptcy case and

was aware of the filing.

---

[1] The $61,353.34 consists of the following amounts: (i) The remaining amount owing under the Minimum

Believing that the Debtor owed it the balance of the Minimum Commission Fee ($22,138.90), on December 1, 2007, meaning after bankruptcy, CIT offset this sum against the Debtor's Credit Balance. CIT did not seek relief from the automatic stay (11 U.S.C. § 362) prior to offsetting the Minimum Fee against the Debtor's Credit Balance.

## III.    The Ledger Debt

Prior to bankruptcy, the Debtor purchased goods and services on open account from vendors Roselon Industries, Inc. ("Roselon"), Carolina Finishing of North Carolina, LLC ("Carolina Finishing"), Regal Manufacturing Company ("Regal Manufacturing"), and Italian Fabric, Inc. ("Italian Fabric"). Within 90 days of bankruptcy, the Debtor owed each of its suppliers (or in the case of Italian Fabric, its factor Finance One, Inc. ("Finance One")) an unsecured debt—Carolina Finishing, $11,920.39; Regal Manufacturing, $9,995.66; Roselon, $346.02; and Italian Fabric/Finance One, $9,078.38.

CIT acquired the Roselon, Carolina Finishing, and Regal Manufacturing claims within 90 days of the Debtor's bankruptcy filing. On January 22, 2008, and after the Debtor's bankruptcy filing, CIT also acquired the $9,078.38 Italian Fabric/Finance One claim. Altogether, the claims acquired by CIT from the Debtor's trade creditors total $31,340.45 (the "Ledger Debt").

## IV.    CIT's Collection and Return of Customer Remittances

After bankruptcy, in April, June, and July of 2008, CIT received payments from the Debtor's customers totaling $11,451.79, which CIT could not trace to any factored receivables. In July and August of 2008, CIT unilaterally returned the monies to the Debtor's customers that

---

Commission Fee ($22,138.90); (ii) the Debtor reserve or credit balance in the amount of $18,675.41; and (iii) the Windsor Fabrics (which is a trade style used by the Debtor for which CIT maintained under the Factoring Agreement as a separate ledger and account) reserve or credit balance ($20,541.03). Aff. of Jane Todd ¶ 12, Adv. No. 09-5048, ECF No. 33-1.

submitted the payments.  The Trustee was not aware of either the customer payments or their

return.

## V.     *Setoff Rights Under the Factoring Agreement*

Paragraph 5 of the Factoring Agreement provides that the Collateral granted by the

Debtor to CIT secures the following:

> [A]ll of [Debtor's] obligations under this Agreement and . . . the prompt
> repayment of indebtedness to [CIT], whether now existing or hereafter
> incurred, including, without limitation, any indebtedness, any indebtedness
> arising from [the Debtor's] purchase of goods or services from any client of
> [CIT] where the account arising from such purchase has been sold to [CIT].

Similarly, Paragraph 14 of the Factoring Agreement provides CIT with a right to offset:

> [A]ny and all sums at any time owed by us to you or deposited by you with
> us shall at all times constitute security for any and all liabilities you may
> now or hereafter owe us, and we may apply or set off such sums against any
> liabilities you owe us at any time whether or not such sums are then due.

Following the Petition Date, CIT recouped or offset the remaining amount owing in

relation to the Minimum Commission Fee ($22,138.90) against the Debtor's Credit Balance.

Aff. of Jane Todd ¶ 15, Adv. No. 09-5048, ECF No. 33-1.  However, rather than offset the

Ledger Debt against the Debtor's Credit Balance, CIT filed its Complaint on October 19, 2009,

requesting, among other things, that the automatic stay be lifted so that CIT could offset the

Ledger Debt against the Debtor's Credit Balance.

Three days later on October 21, 2009, the Trustee filed his Complaint alleging, in nine

enumerated counts, that:

1. The Trustee was entitled to an order directing CIT to turn over the Debtor's Credit
   Balance to the Trustee pursuant to 11 U.S.C. § 542;

2. CIT offset the Ledger Debt against the Debtor's Credit Balance, and such action
   constituted a voidable transfer pursuant to 11 U.S.C. § 549;

3. CIT's offset of the Ledger Debt and its recoupment of the outstanding amount owing

with regard to the Minimum Commission Fee violated the automatic stay under 11 U.S.C. § 362;

4. By virtue of CIT's offset of the Ledger Debt against the Debtor's Credit Balance, the Debtor is subrogated to CIT's rights under its agreements with Regal Manufacturing, Carolina Finishing, and Finance One, and the Debtor is entitled to exercise CIT's rights against the remaining defendants to recover the sums offset by CIT;

5. CIT offset the Ledger Debt against the Debtor's Credit Balance, and such action constituted a voidable transfer pursuant to 11 U.S.C. § 547;

6. CIT offset the Ledger Debt against the Debtor's Credit Balance, and such action constituted a voidable transfer pursuant to 11 U.S.C. § 548;

7. CIT offset the Ledger Debt against the Debtor's Credit Balance, and such action constituted a voidable transfer under North Carolina's Uniform Fraudulent Transfer Act;

8. CIT's offset of the Ledger Debt and its recoupment of the outstanding amount owing with regard to the Minimum Commission Fee are voidable pursuant to 11 U.S.C. §§ 544, 548, 549, and/or 547, and as a result the Trustee is entitled to recover from the defendants the value of the transfers pursuant to 11 U.S.C. § 550; and

9. The Trustee is entitled to an accounting from CIT of the funds paid to CIT pursuant to the Factoring Agreement and to an accounting of all charges made to the account of the Debtor both prior to and after the commencement of the bankruptcy case.

## STANDARD FOR SUMMARY JUDGMENT

Fed. R. Civ. P. 56, made applicable to this proceeding by Bankruptcy Rule 7056, provides that the defendant will prevail on its motion for summary judgment if "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317 (1986). Once the defendant has established that there is an absence of any genuine issue of material fact, the burden shifts to the plaintiff to present some evidence of a genuine issue of material fact. Id. A plaintiff cannot "create a genuine issue of fact through mere speculation or

the building of one inference upon another[.]"  Harleysville Mut. Ins. Co. v. Packer, 60 F.3d

1116, 1120 (4th Cir. 1995).


## STATEMENT OF POSITIONS

CIT maintains that the Ledger Debt, the Minimum Commission Fee, and its attorneys'

fees and expenses are secured by the Collateral per Paragraph 5 of the Factoring Agreement.

Further, pursuant to Paragraph 14 of the Factoring Agreement, CIT asserts a right to offset the

Ledger Debt against the Debtor's Credit Balance and to recoup the Minimum Commission Fee

against the Debtor's Credit Balance.

The Trustee denies that CIT holds a perfected security interest in either the Factored

Receivables or the Debtor's Credit Balance under the Contract.  He believes this case should be

decided under the laws of setoff, specifically Bankruptcy Code Section 553(a).  Under that

provision, and because CIT acquired the Ledger Debt—effectively unsecured trade obligations—

either within the 90 days before bankruptcy, or after bankruptcy, setoff of these sums is

statutorily prohibited.  Similarly, regarding the Minimum Commission Fee, the Trustee argues

CIT's postpetition offset of these sums against the Debtor's Credit Balance is prohibited by

Section 553(a), a willful violation of the Section 362 automatic stay, and an unreasonable

collection of interest under Section 506(b).  CIT's unilateral return of the customer payments

after bankruptcy is viewed by the Trustee to be another willful violation of the automatic stay.

# DISCUSSION

I.   ***Trustee's Count 1: The Trustee is not entitled to turnover of the $61,353.34 under 11 U.S.C. § 542 because: (1) the parties have stipulated that the factored receivables are not estate property, and (2) the Debtor's claims under the Factoring Agreement are in dispute.  However, upon resolution of those disputes the Trustee may be entitled to recover some portion of the same in these Actions.***

Under Bankruptcy Code Section 541(a), estate property includes ". . . all legal or equitable interest of the debtor in property as of the commencement of the case."  11 U.S.C. § 541(a).  The estate is very broad, and may include property not in the possession of the debtor. U.S. v. Whiting Pools, Inc., 462 U.S. 198, 204-06 (1983).

Section § 542(a) provides for turnover of estate property held by creditors to the trustee, upon specified conditions.  In re Suncoast Towers S. Assocs., 1999 WL 549678, at *10 (Bankr. S.D. Fla. 1999); see also In re Lyckberg, 310 B.R. 881, 888 (Bankr. N.D. Ill. 2004).  It follows that a turnover action is not the appropriate tool for acquiring the right to use or possess property if the debtor did not have such right when the case commenced.  Suncoast, 1999 WL 549678, at *10 (citing Creative Data Forms, Inc. v. Pennsylvania Minority Bus. Dev. Auth. (In re Creative Data Forms, Inc.), 41 B.R. 334, 336 (Bank. E.D. Pa. 1984), aff'd 72 B.R. 619 (E.D. Pa. 1985), aff'd, 800 F.2d 1132 (3d Cir. 1986)).  The burden is on the debtor or trustee seeking turnover, Suncoast, 1999 WL 549678, at *10 (citing Groupe v. Hill (In re Hill), 156 B.R. 998, 1006 (Bankr. N.D. Ill. 1993)), and the evidence must demonstrate that the asset in question is part of the bankruptcy estate.  Suncoast, 1999 WL 549678, at *10 (citing Mather v. Tailored Fabrics, Inc. (In re Himes), 179 B.R. 279, 282 (Bank. E.D. Okla. 1995)).

The Trustee seeks turnover of the Debtor's Credit Balance under 11 U.S.C. § 542.  CIT resists, arguing that by virtue of N.C.G.S. § 25-9-109 (". . . [f]ollowing a debtor's outright sale and transfer of ownership of a receivable, debtor-seller retains no legal or equitable rights in the

receivable . . . ." Commentary to N.C.G.S. § 25-9-109, cmt. 5), it owns the factored accounts

receivable—not the Debtor/borrower, and therefore the Credit Balance is not subject to turnover.

The Trustee agrees with CIT that the factored receivables are not estate property.

However, since the Debtor's contract rights under the Factoring Agreement—including the

provisions giving rise to the Debtor's Credit Balance—are estate property, he nevertheless

believes the Credit Balance is subject to turnover.

Since the parties agree that the factored receivables are not estate property, for purposes

of this action, I accept their stipulation.[2] CIT "owns" the receivables, they are not estate

property, and they are not subject to turnover under Section 542.  However, that does not fully

answer the question.  If not the Factored Receivables, the Debtor's contract rights under the

Factoring Agreement are undisputedly estate property.  As the legal successor to the Debtor, the

Trustee may assert those contract rights to seek recovery of the Credit Balance (after allowable

charges and offsets).  However, he may not do so through a turnover action.

Section 542 presumes the property sought to be turned over is clearly the property of the

Debtor that simply is in the possession of another.  FLR Co. v. United States (In re FLR Co.), 58

B.R. 632, 634 (Bankr. W.D. Pa. 1985).  A turnover proceeding cannot be used to determine

"rights of the parties in legitimate contract disputes."  Id.

Here, the proper cause of action is a suit on the contract, the Factoring Agreement.

Neither of the parties' two related actions specifically pleads such a contract claim, but each

bumps around in the general area.  Each side starts from the premise the Debtor was owed at the

---

[2] Several courts have held to the contrary.  These courts look past titles in the factoring agreement to the substance
of the transaction and have found the factor's interest to be a secured claim and not absolute ownership of the
receivable.  Thus the interest comes into the estate upon bankruptcy of the borrower.  See Major's Furniture Mart v.
Castle Credit Corp., 602 F.2d 538 (3d Cir. 1979); In re Evergreen Valley Resort, Inc., 23 B.R. 659 (D. Me. 1982);
In re Carolina Utilities Supply Co., 118 B.R. 412 (Bankr. D. S.C. 1990)).  These cases are well reasoned, but since
our parties agree that CIT owns the factored receivables, I will assume the same.

petition date a Credit Balance of $61,353.34. Each then takes positions whether the Minimum

Commission Fee, the Ledger Debt, and CIT's attorneys' fees and expenses may be deducted

from that sum. The unstated premise of each party's theory is that the Debtor's estate is owed

any remaining balance. That is sufficient for our purposes. Accordingly, while turnover of the

Credit Balance is denied, and Summary Judgment is granted to CIT to this extent, I will entertain

the underlying contract claim, as discussed below.

**II.**     ***Trustee's Count 2: Since CIT has not offset the Ledger Debt against the Debtor's Credit Balance, there was never a "transfer" for purposes of 11 U.S.C. § 549.***

At the date of bankruptcy the Debtor owed Carolina Finishing, Regal Manufacturing

Company, and Italian Fabric/Finance One, Inc. a total of $31,340.45. CIT acquired these trade

obligations within 90 days of bankruptcy or thereafter. Count 2 of the Trustee's Complaint

asserts that CIT made an unauthorized post-petition transfer by setting-off these obligations

against the Debtor's Credit Balance, and Count 2 seeks to avoid this transfer of property under

11 U.S.C. § 549.

Pursuant to Section 549, "[e]xcept as provided in subsection (b) or (c) of this section, the

trustee may avoid a transfer of property of the estate—(1) that occurs after the commencement of

the case; and (2)(A) that is authorized only under section 303(f) or 542(c) of this title; or (B) that

is not authorized under this title or by the court." 11 U.S.C. § 549.

Upon this record, Count 2 fails for lack of a "transfer." CIT has not offset the Debtor's

Credit Balance with the Ledger Debt; nor has it transferred possession, custody, or control of the

Debtor's Credit Balance. Aff. of Jane Todd ¶ 15, Adv. No. 09-5048, ECF No. 33-1. Rather, CIT

filed its Complaint to seek permission from this Court to apply the Ledger Debt and attorneys'

fees against the Debtor's Credit Balance. Other than recoupment of the Minimum Commission

Fee discussed below,[3] the amount in the Debtor's Credit Balance ($61,353.34) has not decreased.

Without (i) a disposition of interest in the Debtor's Credit Balance or (ii) transfer of interest of possession, custody, or control of the Debtor's Credit Balance, there was no "transfer" for purposes of 11 U.S.C. § 549 relating to the Ledger Debt. CIT is entitled to summary judgment on Count 2 of Trustee's Complaint.

**III.    Trustee's Count 3: CIT did not violate the automatic stay because the alleged offset of the Ledger Debt never took place and CIT permissibly recouped the Minimum Commission Fee. As to the Trustee's additional unpled counts relating to whether CIT willfully violated the automatic stay by returning payments to Debtors' customers and whether the Minimum Commission Fee was unreasonable and disallowed under Section 506(b): the automatic stay was not violated and Section 506(b) is inapplicable.**

In Count 3 of his Complaint, the Trustee alleges that CIT willfully violated the automatic stay by offsetting the Ledger Debt and the Minimum Commission Fee against the Debtor's Credit Balance after bankruptcy. By the summary judgment hearing, the Trustee had expanded this theory to include two additional assertions not formally pled in his Complaint: (1) CIT had further violated the stay by returning certain of the Debtor's non-factored accounts receivable to its remitting customers, and (2) the Minimum Commission Fee was unreasonable and hence unallowable under Section 506(b).

I conclude that CIT has not willfully violated the automatic stay, either by making impermissible post-petition offsets against the Credit Balance or by returning the payments to the Debtor's customers after bankruptcy. Section 506(b) is inapplicable to the Minimum Commission Fee.

A.    Section 362, Generally.

Section 362(a) proscribes a wide variety of creditor collection activities after bankruptcy. 11 U.S.C. § 362(a). Among them, Section 362(a)(3) prohibits acts to exercise control over estate

---

[3] The Trustee's Section 549 count does not allege that CIT offset the Debtor's Credit Balance with the Minimum Commission Fee. See Pl.'s Compl. ¶¶ 43-50, Adv. No. 09-5048, ECF No. 1.

property, whereas Section 362(a)(7) stays "setoff of any debt owing to the debtor that arose

before the commencement of the [bankruptcy case] against any claim against the debtor."

Citizens Bank of Maryland v. Strumpf, 516 U.S. 16, 16-19, 21 (1995) (citing 11 U.S.C.

§ 362(a)(3) & (a)(7)).  The stay is meant to be broad and to protect both creditors and the debtor.

Paloian v. Grupo Serla S.A. de C.V., 433 B.R. 19, 37 (N.D. Ill. 2010).  Thus, it applies to

"almost any type of formal or informal action taken against the debtor or the property of the

estate."  Id. (quoting Collier on Bankruptcy ¶ 362.03).

> B.    CIT did not violate Section 362(a)(7) because (i) the alleged offset of the Ledger
>        Debt never took place, and (ii) CIT permissibly recouped the Minimum
>        Commission Fee.

A setoff requires "(i) a decision to effectuate a setoff, (ii) some action accomplishing the

setoff, and (iii) a recording of the setoff."  In re Strumpf, 516 U.S. at 19 (citing Baker v. Nat'l

City Bank of Cleveland, 511 F.2d 1016, 1018 (6th Cir. 1975); Normand Josef Enterprises, Inc. v.

Connecticut Nat'l Bank, 646 A.2d 1289, 1299 (Conn. 1994)).

If an action that is alleged to be an impermissible setoff is in fact not a setoff, then there

is no violation of the automatic stay.  See In re Dehn, 2002 WL 32115833 at *1 (Bank. E.D. Ark.

2002) (holding that "an administrative freeze on a debtor's account does not constitute a setoff

under 11 U.S.C. § 362(a)(7)[,]" and as a result there was no violation of the automatic stay); In re

Strumpf, 516 U.S. 16 (holding that petitioner bank's "administrative hold" on the debtor's

checking account was not a setoff within the meaning of Section 362(a)(7) since the bank simply

refused to pay its debt temporarily while it sought relief from the stay; and since there was no

setoff, the bank did not violate the automatic stay).

> 1.  Ledger Debt

For the reasons stated in regard to Count 2 in Section II above, the Trustee's contention

that CIT violated the automatic stay by offsetting the Debtor's Credit Balance against the Ledger

Debt fails.  There was no such offset and no charges were effected against the Debtor's Credit

Balance.

2.  Minimum Commission Fee

The Trustee further alleges that CIT violated the automatic stay by offsetting the

Minimum Commission Fee (or the remaining amount owing to CIT related to such fee) against

the Debtor's Credit Balance after bankruptcy.  The parties agree that CIT did apply the Minimum

Commission Fee of $22,138.90 against the Credit Balance after bankruptcy.  They disagree

whether this action constituted a general setoff or a recoupment.  The Trustee contends it was the

former; CIT, the latter.

In North Carolina, a right to setoff exists when there are mutual debts between parties.

Durham v. SMI Industries Corp., 882 F.2d 881, 883 (4th Cir. 1989) (citing Old Southern Life

Ins. Co. v. Bank of North Carolina, 244 S.E.2d 264, 271 (N.C. App. 1978)).  Both mutuality of

parties and mutuality of claims must exist to obtain setoff in North Carolina.  In re Carolina

Acoustical and Flooring, Inc., 415 B.R. 186, 191 (Bankr. M.D.N.C. 2009) (citing In re Battery

King Mfg. Co., Inc., 83 S.E.2d 490, 492 (N.C. 1954)).  Specifically, each party must own "his

own claim in his own right severally with the right to collect it in his own right and severally."

In re Carolina, 415 B.R. at 191-92 (quoting In re Britton, 83 B.R. 914, 918 (Bankr. E.D.N.C.

1988)).  If such a right exists under North Carolina law, then"[S]ection 553 of the Bankruptcy

Code preserves the 'right of a creditor to offset a mutual debt owing by such a creditor to the

debtor that arose before the commencement of the case under this title against a claim of such

creditor against the debtor that arose before the commencement of the case. . . .'"  In re Carolina,

415 B.R. at 191 (quoting 11 U.S.C. § 553).

16

Recoupment is a form of setoff that involves netting reciprocal obligations stemming from the same transaction. In re Lincoln-Gerrad, USA, Inc., 2002 WL 1676564, at *5 (Bankr. M.D.N.C. 2002). Because it pertains to the same transaction, recoupment essentially constitutes a defense to a debtor's claim against a creditor. Id. Recoupment has been recognized by bankruptcy courts; however, application of the doctrine is limited to "situations in which the subject matter of the creditor's claim arises from the same transaction or contract as the debtor's claim against the creditor." Id. A recoupment obtained by a creditor is not a violation of the automatic stay. In re All Trac Transp., Inc., 306 B.R. 859, 878 (Bankr. N.D. Tex. 2004) (citing Kosadnar v. Metropolitan Life Ins. Co. (In re Kosadnar), 157 F.3d 1011, 1016 (5th Cir. 1998)).

When courts, for recoupment purposes, consider whether conflicting claims originated from the same transaction or contract, they generally focus on the facts and equities of a given case, rather than employing a specifically defined test or standard. In re Lincoln-Gerard, 2002 WL 1676564, at *5 (citing United States v. Dewey Freight System, 31 F.3d 620, 623 (8th Cir. 1994)).

Here, both parties' claims arise out of the same contract, the Factoring Agreement. CIT's claim against the Debtor, the Minimum Commission Fee, is provided for in Paragraph 23 of the Factoring Agreement. The Trustee's claim to recover the Credit Balance is not prescribed in any particular paragraph of the agreement, but rather from its four corners. Both parties acknowledge the Debtor's rights to the Credit Balance, whatever it may be. The parties also agreed to a contractual right of setoff in Paragraph 14 of the Factoring Agreement.

Since both parties' claims arose from the same transaction, CIT had the right to recoup the remaining amount owing under the Minimum Commission Fee against the Debtor's Credit Balance without the same constituting a violation of the automatic stay. As to Count 3 of

Trustee's Complaint, to the extent it relates to the Minimum Commission Fee, CIT is entitled to summary judgment in its favor.

        C.    <u>CIT's return of remittances on unfactored accounts receivable to the Debtor's customers did not constitute willful violations of the automatic stay.</u>

After bankruptcy, CIT continued to receive lockbox payments from the Debtor's customers on factored accounts receivable. In April, June, and July 2008, CIT collected an additional $11,451.79 from debtor's customers on accounts that apparently had not been factored. CIT was unable to match up these payments to any factored receivables and therefore returned these remittances to the Debtor's customers. The Trustee was not informed of the additional collections.

Because CIT returned these payments to the remitting customers, with knowledge of the debtor's bankruptcy, the Trustee maintains that CIT committed knowing, willful, and blatant violations of the stay.

This Court cannot agree, for several reasons. First, the Trustee cites no case law holding a factor's return of a misdirected payment back to the remitting customer to be a willful violation of the automatic stay. The undersigned has located no such authority either.

Second, CIT explained at hearing that its lockbox collections are large volume, automated processes. When its systems failed to correlate these payments against any invoices which CIT had factored, CIT's systems automatically returned the payments to the paying party. There is no evidence in this record to suggest that this was a case of a creditor purposely diverting property from the bankruptcy estate in knowing violation of the stay or the Debtor's rights. This was a routine automated action in keeping with CIT's lockbox processes. More importantly, CIT neither sought to control these monies nor to divert them. Rather, it simply returned these checks to whence they came: the Debtor's customers. The customer was

thereafter free to pay the debts to the Debtor; the Trustee was free to collect these sums from the customer.  Finally, since these sums were still owing to the Debtor after CIT returned the checks, the bankruptcy estate was not damaged by CIT's actions.

In In re Hamrick, the U.S. District Court for this judicial district cautioned bankruptcy attorneys against employing a trip wire approach to Section 362 stay violations.  In re Hamrick, 175 B.R. 890 (W.D.N.C. 1994).  This would appear to be one of those occasions where the creditor's action was not in willful disregard of the bankruptcy laws but simply a reasonable business practice of not keeping that which was not its own.  At most, the return of these checks to the remitting parties was a technical stay violation that did not damage the bankruptcy estate.  Sanctions are not called for.  Therefore, as to the portion of Trustee's Brief dealing with CIT's return of the $11,451.79 to the Debtor's customers after bankruptcy, CIT is also entitled to summary judgment.

   D.    The Trustee's argument that the Minimum Fees are unreasonable interest or costs under 11 U.S.C. § 506(b) fails because the Minimum Fees are a part of CIT's underlying prepetition claim and not interest or costs on that claim.

The Trustee argued in his Brief and at hearing that the Minimum Fees should not be allowed because they represent unreasonable interest or costs under 11 U.S.C. § 506(b).

 Section 506(b) states that an oversecured creditor will be allowed "interest on [their] claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose."

Section 506(b) promotes fairness among creditors when an oversecured creditor has a claim against the estate for interest and fees accruing on its claim after bankruptcy, whereas other unsecured creditors stand not to recover even their principal.  United Savings Ass'n. v. Timbers of Inwood Forest, 484 U.S. 365, 372-73 (1988).  Congress has struck a balance here by allowing

a secured creditor fees, costs, and charges only if its contract provides for them, while allowing

interest if it is either provided for under contract *or* under applicable law.  4 Collier on

Bankruptcy ¶ 506.04[2][a], at 506-101 (16th ed. 2010) [hereinafter Collier].  Further, fees, costs,

and charges must be "reasonable."  U.S. v. Ron Pair, 489 U.S. 235, 241 (1989).

The Trustee considers the Minimum Financing Charge to be postpetition interest on

CIT's debt.  He argues:

> As a general principle money paid towards a loan or other type of financing,
> not directly applied to the principal is interest on the loan regardless of the
> language used to put a title on the payment received.  Even if interest
> payments are contemplated by the agreement between the parties, any
> amounts paid above the interest payment contemplated whether called
> interest or otherwise are considered interest.

Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. 7, Adv. No. 09-5048, ECF No. 35.

Having deemed the Minimum Commission Fee to be interest, the Trustee totals the

contract interest charged by CIT on its factored amounts, factoring fees for the final contract

year, and the minimum factoring fee.  He concludes that CIT has received a 51% return on its

money.  The Trustee asks this Court to disallow the $22,138.90 Minimum Commission Fee as an

offset to the Credit Balance because it is excessive.

CIT disagrees, arguing that the Minimum Commission Fee is a part of its prepetition

debt, not postpetition interest.  Since Section 506(b) applies only to *postpetition* interest and fees,

CIT considers the Trustee's theory to be misplaced.  And even if Section 506(b) were applicable,

CIT's asserts that it has lost $300,000 as a result of its purchasing invoices from the Debtor.  Aff.

of Jane Todd ¶ 6, Adv. No. 09-5048, ECF No. 33-1.  As such, the Debtor's obligation to pay a

$35,000 minimum commission fee in exchange for (i) receiving immediate payment of its

outstanding customer invoices, and (ii) CIT suffering a $300,000 loss, means the Minimum

Commission Fee was not unreasonable and did not create a windfall to CIT to the detriment of

general unsecured creditors.

I agree with CIT that the Trustee's reliance on Section 506(b) to attack the Minimum

Commission Fee is misplaced.  In the first place, such a count is not found in the Trustee's

Complaint.  While CIT asserted a Section 506(b) recovery right in its Complaint in Adv. No. 09-

5042 (Count 3) and its Counterclaim in Adv. No. 09-5048 (Count 3), those claims only sought

recovery of its postpetition attorneys' fees and expenses.

Further, and as CIT's notes, Section 506(b) addresses a creditor's right to *postpetition*

*interest*, fees, costs, and charges on the creditor's secured claim.  Collier, supra, ¶ 506.04, at 506-

95 (emphasis added).  The Minimum Commission Fee is a component of CIT's underlying

prepetition claim and not a postpetition accrual on that claim.  The Minimum Commission Fee

arises under the Factoring Agreement because the Debtor failed to factor sufficient sums during

the contract year.  Factoring Agreement ¶ 23, Adv. No. 09-5048, ECF No. 33-2.

The Minimum Commission Fee is also not interest.  While the Trustee treats the

Minimum Commission Fee as interest on CIT's factoring debt, he cites no legal authority to

support his position.  As CIT argues, in the receivables factoring industry, a minimum

commission is part of the risk proposition and bargained-for consideration in a Factoring

Agreement.  It serves to induce a factor to extend financial accommodations to a client,

including, without limitation, assuming the risk of non-payment on approved receivables, which

in this case cost CIT in excess of $300,000 in 2006.

In sum, with regard to Count 3 of Trustee's Complaint and the two additional assertions

not formally pled in Plaintiff's Complaint: (1) the alleged offset of the Ledger Debt never took

place, so there was no violation of the automatic stay; (2) CIT permissibly recouped the

Minimum Commission Fee after bankruptcy, and this also was not a stay violation; (3) CIT's

return of unidentified remittances to the Debtor's customers was not a willful violation of the

stay; and (4) Section 506(b) is inapplicable.  CIT is entitled to summary judgment on Count 3 of

the Trustee's Complaint as it relates to violations of the automatic stay, as well as on the two

additional counts discussed above that were not formally pled in Trustee's Complaint.  CIT is

also entitled to summary judgment on Count 1 of its Complaint and Count 1 of its Counterclaim,

as they relate to recoupment of the Minimum Commission Fee[4].

**IV.    *The Trustee is entitled to Summary Judgment on his unpled count regarding the
Ledger Debt as discussed in his Brief, and on Trustee's Count 3 to the extent it seeks to
enjoin CIT from offsetting the Credit Balance against the Ledger Debt.  Trustee is also
entitled to summary judgment on Counts 1 and 2 of CIT's Complaint and
Counterclaim, as to whether CIT has a perfected security interest in the Credit Balance
and whether it can be applied to the Ledger Debt, as well as on CIT's additional unpled
count arguing that it is not prohibited from offsetting the Ledger Debt against the
Credit Balance.***

Our parties agree the accounts receivable factored by the Debtor with CIT are not

themselves bankruptcy estate property.  However, they reach polar opposite conclusions as to

whether CIT may offset the Ledger Debt against the Debtor's Credit Balance under the Factoring

Agreement.

Because the receivables are not estate property, CIT appears to assume that neither is the

$61,353.34 Debtor's Credit Balance.  Further, in Count 1 of its Complaint, CIT contends that it

holds a perfected security interest in all of the Collateral—including the Credit Balance—and

that this secures all of its debts, including the Ledger Debt which it purchased shortly before

---

[4] Count 1 of CIT's Complaint and Counterclaim alleges that CIT has a security interest in all Collateral, specifically
the Credit Balance, and that the same secures—among other things—the Minimum Commission Fee.  As to be
discussed in Section IV, CIT does not have a security interest in *all* Collateral, and Trustee is entitled to summary
judgment to that effect.  Specifically, the Minimum Commission Fee is not secured by the Collateral because it was
already recouped in a valid transaction after bankruptcy.

       To the extent CIT requests a judgment modifying the automatic stay to allow CIT to recoup the Minimum
Commission Fee in Count 2 of its Complaint and Counterclaim, this request is now moot; the Court's finding that
CIT already recouped the Minimum Commission Fee, and that said act was not a stay violation, moots CIT's
request.

bankruptcy and even after bankruptcy.  In Count 1 of its Complaint, CIT seeks a declaratory

judgment to this effect, and it asks for relief from stay in Count 2 to permit it to apply the

Debtor's Credit Balance to pay the Ledger Debt.

The Trustee turns CIT's argument on its head, arguing that since the Debtor did not own

the factored accounts receivable, it had no ability to grant CIT a security interest in the same.

Further, the Trustee observes that CIT could hardly hold a security interest in monies (the

Debtor's Credit Balance) that it owes to the Debtor.  This being the case, the Trustee says the

parties' rights are determined under the law of setoff, specifically Bankruptcy Code Section

553(a).

I agree with the Trustee.  Since the parties have stipulated that the factored accounts

receivable are not estate property, neither are the proceeds of those receivables.  However, the

Debtor's contract rights under the Factoring Agreement are undisputedly part of the estate,

including the right to recover any remaining credit balance.

Here, whatever secured claim CIT holds in monies it owes the Debtor arises from the

legal doctrine of setoff, a point made clear from the parties' agreement.  The last sentence of

Paragraph 2 in the Factoring Agreement specifically provides that CIT may setoff the Ledger

Debt against the Debtor's Credit Balance:

> Should you purchase goods or services from another of our clients and the
> account arising from such purchase be sold to us, then we may at any time
> without notice to you set off the balance due us on such account against
> amounts we owe you.

Reinforcing the parties' understanding, Paragraph 14 of the Factoring Agreement,

entitled "Set Off," contemplates a right of setoff of mutual debts such as these, stating:

> [a]ny and all sums at any time owed by us to you or deposited by you with
> us shall at all times constitute security for any and all liabilities you may
> now or hereafter owe us, and **we may apply or set off such sums against**

**any liabilities you owe us** at any time whether or not such sums are then due (emphasis added).

Thus, whether CIT is entitled to set off the Credit Balance Debt it owed the Debtor against the claims that it purchased from the Debtor's vendors is decided by reference to Bankruptcy Code Section 553.

A.    Section 553, Generally.

Generally, Section 553 does not create a right of setoff; ". . . [i]t merely preserves any right of setoff accorded by state law."  Durham v. SMI Industries Corp., 882 F.2d 881, 883 (4th Cir. 1989).  However, in certain circumstances Section 553 limits the application of setoff rights already available under nonbankruptcy law.  Two of these exceptions are of importance in this case:

(i) Section 553(a)(2)(A) prohibits the setoff of claims transferred to the creditor after the commencement of the case, and

(ii) Section 553(a)(2)(B) prohibits the setoff of claims transferred to the creditor within 90 days of bankruptcy and while the debtor was insolvent.

Pursuant to Section 553(c), it is presumed that the debtor was insolvent during that ninety day period.

B.    The Italian Fabric Claims.

Before bankruptcy, the Debtor purchased products from Italian Fabric on open account and owed its vendor $9,078.38 shortly before bankruptcy.  The vendor, Italian Fabric, factored its receivable with its own factor, Defendant Finance One.  At the date of bankruptcy, the Debtor owed an unsecured trade debt to ItalianFabric/Finance One.

After bankruptcy, on January 22, 2008, CIT acquired the Italian Fabric/Finance One claims by assignment.  CIT's Req. for Adjustment of Past Due Receivables for Client, Finance One, Jan. 22, 2008, Adv. 09-5048, ECF No. 35-1.

24

CIT maintains that by virtue of its prepetition security interests in the Debtor's property, or alternatively by offset, it is entitled to offset the claim against the Credit Balance debt that CIT owes the Debtor.  I disagree.

When the Debtor filed bankruptcy, Section 553(a)(2)(A) became applicable.  By its express terms, a legal prohibition was imposed against CIT offsetting the claim it purchased from Finance One after bankruptcy against its own obligation to the debtor, the Debtor Credit Balance liability.

Nor could the Italian Fabric/Finance One liability be transformed from an unsecured trade claim into a part of CIT's secured claim.  The bankruptcy filing created a legal estate, 11 U.S.C. § 541(a), and caused a line of demarcation between prepetition and postpetition claims. In re Reynard, 250 B.R. 241, 245 (Bankr. E.D. Va. 2000).  A hypothetical execution occurred on the Debtor's personal property in favor of the bankruptcy estate.  11 U.S.C. § 544(a)(2).  And the bankruptcy filing limited both (i) the sums that CIT could treat as a secured debt, and (ii) the property against which its prepetition claims could be asserted.  Per Code Section 552, CIT's collateral was limited to its prepetition collateral plus proceeds of the same.  The bankruptcy stay prohibited any action to create further liens against other estate property.  Section 362(a)(3) and (4).  Under Section 364 and 549, such a transfer of estate property would require prior court approval after notice to creditors.

Given these restrictions, CIT could not acquire a security interest in the Credit Balance after bankruptcy to collateralize a prepetition unsecured debt it purchased from Finance One. Even in CIT's hands, the Italian Fabric claim remained an unsecured debt.  Consequently, CIT is not entitled to relief from stay to credit or setoff this sum against the Credit Balance.  Section 553(a) precludes the offset.

C.    <u>Claims Purchased by CIT in the 90 Days Preceding Bankruptcy.</u>

Similarly, the Carolina Finishing claims ($11,920.39), the Regal Manufacturing claims ($9,995.66), and the Roselon claims ($346.02) were purchased by CIT from unsecured creditors of the Debtor in the 90-day window preceding bankruptcy.  Thus, Section 553(a)(2)(B) is applicable and expressly prohibits the setoff of these transferred claims against the Debtor's Credit Balance.

D.    <u>CIT's Attempt to Use Its Security Interest in the Debtor's Property to Collateralize Unsecured Debts to Its Vendors Fails.</u>

CIT argues at length that since it was a secured creditor of the Debtor with equity, it was also a secured creditor as to the debts that it acquired from the Debtor's trade creditors.  Again, I cannot agree.  CIT's focus is on its own debt whereas it should be on the position of these trade creditors.  Entering the 90-day window before bankruptcy, CIT may have been fully secured, but the Debtor's trade creditors (the "Vendor Debt") were unsecured creditors.  Had any of these creditors obtained a security interest in the Debtor's property during that 90-day period, the transfer of that security interest would have constituted an avoidable Section 547 preference.  Similarly, had the Debtor given these creditors collateral after bankruptcy to secure their unsecured claims, once again the transfer would have been avoidable under Section 549.

Section 553(a)(2)(A) and (B) serve to replicate this result as to the setoff of claims purchased near or after bankruptcy.  In their absence, a secured creditor with equity in its collateral could buy up unsecured debt for pennies on the dollar, and by virtue of its own security interest transmute unsecured claims into secured debt—thereby usurping the debtor's equity, to the detriment of unsecured creditors.

If there is any remaining doubt that these were proscribed setoffs, it should be remembered that the bankruptcy court is empowered to exercise its powers to ensure that

26

"substance will not give way to form, [and] that technical considerations will not prevent
substantial justice from being done."  In re Shearin, 224 F.3d 346, 353 (4th Cir. 2000) (quoting
Pepper v. Litton, 308 U.S. 295, 304-05 (1939)).  To treat CIT as secured by virtue of a debt it
owes to the Debtor (the Credit Balance) as to unsecured claims owed by the Debtor which it
purchased during the preference window or after bankruptcy, would produce a most unfair result.
I cannot dignify CIT's effort by terming it either a secured claim or a permitted setoff.

The Trustee is entitled to Summary Judgment on his unpled count regarding the Ledger
Debt raised in his Brief, as well as to his contention in Count 3 of his Complaint that CIT should
be enjoined from offsetting the Credit Balance against the Ledger Debt.  Trustee is also entitled
to summary judgment on Counts 1 and 2 of CIT's Complaint and Counterclaim, as they relate to
whether CIT has a perfected security interest in the Debtor's Credit Balance securing the Ledger
Debt and whether the Credit Balance can be applied to the Ledger Debt.  Similarly, CIT's
additional unpled count argued in its Brief in Support of its Motion, that it is not prohibited from
offsetting the Ledger Debt against the Debtor's Credit Balance, is also decided in the Trustee's
favor.

**V.    *Trustee's Counts 4-8: Because CIT did not offset the Ledger Debt, and will not be
permitted to do so, these claims are moot and need not be decided.***

In Count 4, the Trustee asserts a right of subrogation to CIT's rights, as against Real
Manufacturing, Carolina Finishing, Italian Fabric, and Finance One.  In Count 5, the Trustee
argues the attachment of CIT's security interest to the Debtor's Credit Balance and/or the offset
of the same against the Ledger Debt was preferential under Section 547.  Count 6, pled as an
alternative to Count 5, contends that the attachment/offset was a fraudulent conveyance under
Section 548.  Alternative Count 7 interprets the attachment/offset as avoidable transfers under
the North Carolina Uniform Fraudulent Transfer Act, N.C.G.S. Sections 39-23.4 et seq.  Count 8

27

seeks to utilize Bankruptcy Code Section 550 to recover the value of the avoided transfers from the Defendants.

Each count assumes that CIT has either already setoff the Ledger Debt against the Credit Balance or will be permitted to do so. Again, CIT did not offset the Ledger Debt before bankruptcy, and under the holding in Section IV above, it will not be permitted to do so now. Therefore, Counts 4-8 are moot and will be DISMISSED.

**VI.** *Trustee's Count 9: Apart from a delineation of CIT's Section 506 interest and fees, no further accounting is required from CIT. CIT's Count 3 and Counterclaim Count 3: CIT is entitled to certain attorneys' fees and expenses, to be determined at trial.*

In response to the Trustee's First Set of Interrogatories and Requests for Production of Documents, CIT delivered to the Trustee on November 10, 2010, an accounting of all charges made to the Debtor's account both prior to and after the commencement of the bankruptcy case. With one notable exception, that accounting has enabled us to determine the issues presented by this litigation.

The Debtor's Credit Balance exceeds the already recouped Minimum Commission Fee. However, CIT contends that since bankruptcy, it has incurred and continues to incur attorneys' fees and expenses enforcing the Factoring Agreement and collecting its debt. Aff. of Jane Todd ¶ 16, Adv. No. 09-5048, ECF No. 33-1. In Count 3 of CIT's Complaint (in 09-5042) and in Count 3 of CIT's Counterclaim (in 09-5048), CIT asks that it be permitted to assess these costs against the Debtor's Credit Balance pursuant to Section § 506(b).

Partial summary judgment is granted in CIT's favor as to whether CIT is entitled to attorneys' fees and expenses, but only to the extent such allowance complies with the rest of this opinion, i.e., attorneys' fees and expenses will only be allowed out of the net Credit Balance, only to the extent of equity to support the same and only as allowed by Section 506(b). The

28

determination of those fees and expenses is reserved for trial.

The determination of the amount of CIT's allowable Section 506(b) fees and expenses would appear to be the only remaining issue to be decided.  When that issue is decided, should a balance remain owing to the Debtor under the Credit Balance, CIT will be ordered to pay it over to the Trustee.  To that end, CIT is instructed to file an application and accounting for the sums that it contends are owing under Section 506(b), and to serve the same upon the Trustee.  After affording a reasonable time for the Trustee to evaluate the submission, the parties are directed to contact Chambers to schedule a trial or hearing on the application and on any remaining matters in these actions.

**SO ORDERED.**

**This Order has been signed electronically.**      **United States Bankruptcy Court**
**The judge's signature and court's seal**
**appear at the top of the Order.**